Deposition of Virginia Ezell
Taken December 14, 2006

Morgan v. Ezell
Case No. 4FA-05-1876 CI

---

### Page 1

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA
FOURTH JUDICIAL DISTRICT AT FAIRBANKS

LORI MORGAN, )
)
    Plaintiff, )
)
    vs. )
)
VIRGINIA EZELL, )
)
    Defendant. )
_____ )
VIRGINIA EZELL, )
)
    Third-Party Plaintiff, )
)
    vs. )
)
CLAY KRISTIANSEN, )
)
    Third-Party Defendant. )
_____ )

Case No. 4FA-05-1876 CI

VIDEOTAPE DEPOSITION OF VIRGINA EZELL
Taken Thursday, December 14, 2006
From the hour of 12:56 p.m. to 1:51 p.m.

Pages 1 through 53, inclusive
Volume 1
Taken by Counsel for Defendant Ezell
At
Offices of Heartland Court Reporters
100 Cushman Street, Suite 308
Fairbanks, Alaska 99701

Reported by:
CAROL A. McCUE, RMR
Heartland Court Reporters

---

### Page 2

APPEARANCES

For Plaintiff:
    JOHN FRANICH, ESQ.
    1305 21st Avenue, Suite 204
    Fairbanks, AK 99701
    907-456-5100
For Defendant and Third-Party Plaintiff Ezell:
    PAUL W. WAGGONER, ESQ.
    LAW OFFICES OF PAUL WAGGONER
    632 Christensen Drive, Suite 200
    Anchorage, AK 99501-2109
    907-277-0514

For Third-Party Defendant:
    BARRY J. KELL, ESQ.
    CALL, HANSON & KELL
    250 H Street
    Anchorage, AK 99501-2112
    907-258-8864
Witness:
    VIRGINIA EZELL
    December 14, 2006
Reported by:
    CAROL A. McCUE, RMR
    Heartland Court Reporters

       BE IT KNOWN that the deposition of the
above-named witness was taken this date in the
foregoing action before Carol A. McCue, Registered
Merit Reporter and Notary Public within and for the
State of Alaska.

---

### Page 3

INDEX

WITNESS:  VIRGINA EZELL                    December 14, 2006
EXAMINATION                                            Page

Direct Examination by Mr. Waggoner.............4
Fill-In Videotape Transcript..................27
Cross-Examination by Mr. Franich..............31
Cross-Examination by Mr. Kell.................48

Redirect Examination by Mr. Waggoner..........49

EXHIBITS

Exhibit Number                                  Page Marked
1:     10-page document, Recorded
     Statement of Virginia Ezell
     Taken July 26, 2005..................4

---

### Page 4

1              P R O C E E D I N G S
2    (The following proceedings commenced
3    at 12:56 p.m., December 14, 2006.)
4    (Exhibit 1 marked.)
5    (Opening statement read by the
6    reporter.)
7    THE REPORTER:  Will counsel please introduce
8    themselves.
9    MR. FRANICH:  John Franich for the plaintiff.
10    MR. WAGGONER:  Paul Waggoner for Virginia
11    Ezell.
12    MR. KELL:  And Barry Kell for Clay
13    Kristiansen.
14    (Witness sworn.)
15           VIRGINA EZELL,
16    being called as a witness, having been first duly sworn
17    to state the truth, the whole truth, and nothing but
18    the truth, testified under oath as follows:
19           EXAMINATION
20    BY MR. WAGGONER:
21    Q.   Okay.  This is Paul Waggoner.  How are you
22    today?
23    A.   I'm very good, thank you.
24    Q.   Okay.  And we scheduled your deposition here,
25    it's December 14th, 2006?

EXHIBIT_____K____
____1____OF____5____

Page 9

1    Q.    Okay.
2    A.    And -- and that confused me in talking to him
3    because I...
4    Q.    Okay.  Yes.  Page 2 of this exhibit, this
5    Mr. VanGuilder talked to you and he said that --
6    that -- that he was speaking to you concerning an
7    incident that was supposed to have occurred in October
8    of twenty -- 27th of 2004.
9    A.    Yes.
10   Q.    Do you see that?
11   A.    Yes.
12   Q.    And where was Clay Kristiansen in October of
13   2004?
14   A.    He was in jail, I believe he was at FCC.  He
15   was subsequently transferred down to Point McKenzie,
16   but I'm not sure on that particular date.
17   Q.    Okay.
18   A.    He was incarcerated anyway.
19   Q.    And he -- had entered a plea on charges
20   against him at that point; is that right?
21   A.    Yes.
22   Q.    Okay.  Now, it's my understanding that he had
23   served almost two years in jail; is that right?
24   A.    Yes.
25   Q.    And you use the term "FCC."  What does that

Page 10

1    mean?
2    A.    Fairbanks Correctional Center.
3    Q.    Okay.
4    A.    Or center, I guess.
5    Q.    And he served some time there, and then where
6    did he go?
7    A.    Then they sent him to Point McKenzie farm.
8    Q.    Okay.  Now --
9    A.    Country farm.
10   Q.    You said he was in jail at the time.  I think
11   that he had actually been arrested in August of 2004,
12   wasn't he?  Isn't that the -- kind of last incident
13   with Lori Morgan?
14   A.    Yes, but that -- but he was arrested for DWI
15   earlier than that, like in May, I believe.
16   Q.    Okay.  And he had gotten out on bail; is that
17   right?
18   A.    He got out on bail.  Yeah.  And then -- yeah.
19   Q.    And was there -- was there some phone
20   conversation between Lori Morgan and Clay Kristiansen
21   about a dead cat or something before this last
22   incident?
23   A.    Yes.
24   Q.    Okay.  And you -- you could hear just one half
25   of the conversation and -- and see what reaction --

Page 11

1    A.    Yes.
2    Q.    -- Clay Kristiansen had to it?
3    A.    Yes.
4    Q.    And so why don't you describe for the jury
5    what -- what you saw with regard to that.
6    A.    Well, he -- he came to tears because he loved
7    that cat, and they had had -- they had it together
8    for -- for over a year.  I don't know, maybe two years.
9    And she said, it's dead.
10        MR. FRANICH:  Objection.  For the record,
11   you -- I'm going to object to that as being hearsay.
12   My understand from the lead-up that you could only hear
13   one side of the conversation, so you could not have
14   heard her say anything.
15        MR. WAGGONER:  Well, you made your objection.
16        MR. FRANICH:  Exactly.
17   BY MR. WAGGONER:
18   Q.    So I'm interested in the effect of this
19   conversation, whether it was something that Clay
20   Kristiansen misunderstood or -- or anything like that.
21   What effect did it have on Clay Kristiansen that --
22   that he was under the impression that the cat was dead?
23   A.    Well, he -- he was, I think, heart -- he
24   wasn't heart -- he was heartbroken that the cat was
25   dead, but that's -- that's kind of a strong way to put

Page 12

1    it, but he was cry -- almost -- he was crying.  Tears
2    coming down his face.  And, you killed my cat, she
3    killed my cat.
4    Q.    Okay.  And then sometime after that, did the
5    police come to your house?  Do you remember that?
6    A.    After that?
7    Q.    After --
8    A.    Yeah.
9    Q.    -- he was concerned about --
10   A.    Yes.
11   Q.    Right or wrong, he was --
12   A.    Yes.
13   Q.    -- concerned about the cat.  And -- and were
14   they trying to find Clay at that point?
15   A.    It was -- it was two days later.  It wasn't
16   the same day.
17   Q.    Okay.
18   A.    Yeah.  And Clay was here, he was in the
19   backyard.
20   Q.    Okay.  And so the police came and talked to
21   him?
22   A.    Yes.
23   Q.    Okay.  Now, and then --
24   A.    The police came and took him away.
25   Q.    Yeah.  They arrested him?

3 (Pages 9 to 12)

EXHIBIT    K
PG    2    OF    5

Heartland Court Reporters
Carol A. McCue, RMR

E-mail:  carol.mccue@acsalaska.net

Telephone:  907-452-6727
Fax:  907-488-7701

Deposition of Virginia Ezell
Taken December 14, 2006

Morgan v. Ezell
Case No. 4FA-05-1876 CI

## Page 13

1    A.   Yes.

2    Q.   Okay.  Now, I would like you to turn to Page 8
3  of the exhibit there.

4    A.   That light is a little bright in my eyes.
5  Could we just angle it just slightly?  That's a little
6  better.

7    Q.   And this is kind of -- I guess it's not really
8  at the end of your statement, but it's a little bit at
9  the end there.  And at Line 17 they asked -- the
10 interviewer asked if you had anything you wanted to
11 add, and I think your answer was there was, no, except
12 I -- I -- if such a beating went on, which it must have
13 because after all, he did get arrested, and I heard it,
14 I heard -- I heard the lawyers in trial, but I can
15 honestly say I would have come to her defense had I
16 heard anything, but I did not.  Is that right?

17   A.   That's correct.

18   Q.   Okay.  Now, is it -- is it -- I'm asking you
19 if that last part of it's true, that if you had heard
20 something about there being domestic violence against
21 Lori Morgan, would you have tried to help her?

22   A.   Of course, I would, yes.

23   Q.   Okay.  But did you hear anything?

24   A.   No, I didn't.

25   Q.   Okay.  And the statement, the context of it,

## Page 14

1  they really -- it's kind of the wrong date as they
2  started out --

3    A.   Yes.

4    Q.   -- because the -- the Complaint says the wrong
5  date.

6    A.   Yes.

7    Q.   But even if we're talking about six months
8  before that or anything, did you -- did you -- do you
9  have any recollection of hearing anything that --

10   A.   No, I do not.

11   Q.   Okay.  Now, how long had there been a
12 relationship between Clay and Lori?

13   A.   Six -- six years at the time.

14   Q.   Okay.

15   A.   About six or seven years.

16   Q.   Yeah.  And did they -- did they have any
17 drinking or alcohol kind of issues?

18   A.   They both drank a lot.

19   Q.   Okay.  And did -- did they argue some?

20   A.   Verbally, yes, sometimes.  And -- but they
21 also -- they also had very compatible times together.

22   Q.   Okay.  Did -- did Lori ever come to you and --
23 and ask you to call the police or help her with a --
24 you know, a domestic violence or anything done --

25   A.   No.

## Page 15

1    Q.   -- by your son?

2    A.   No.

3    Q.   Okay.  And did you -- did you sometimes help
4  Lori when she had problems?

5    A.   Yes.  Several times.  Many times.

6    Q.   Okay.  What kinds of things would you do to
7  help her?

8    A.   Well, she didn't have transportation, I would
9  take her to the Tanana Valley Clinic for doctor visits,
10 and I would take her -- pick up prescriptions.  And I
11 took her a couple times to a doctor over on Lathrop
12 Street.  Oh, and I'd take her grocery shopping.  I
13 would take her down to the store, drop her off and pick
14 her up when she was done shopping.

15   Q.   Okay.  And in all those different times when
16 you were with her, helping her that way, did she
17 complain to you about domestic violence and ask you to
18 help her?

19   A.   No.

20   Q.   Did she ever ask you to call the police?

21   A.   No.

22   Q.   Now, I think you told us what your work hours,
23 but I wonder if you could repeat that for us.  What --
24 what hours did you work?

25   A.   I work Tuesday just through Friday, from

## Page 16

1  6:00 a.m. until 11:00 a.m.

2    Q.   Okay.  And do you have any plans to retire at
3  all, or you like your work?

4    A.   I like it.

5    Q.   Okay.

6    A.   And it's very easy.

7    Q.   Okay.  And what do you do there?

8    A.   Answer the phones mostly.  Take customer
9  complaints or orders.

10   Q.   And if you get to -- to work at 6:00 a.m.,
11 what time do you get up in the morning?

12   A.   In winter, I get up at 4:30 -- at 4:30 to, you
13 know, get the cars going and -- the car going and all.
14 But 4:30, 4:45, either one.

15   Q.   Okay.

16   A.   So...

17   Q.   And so if you get up that early, what time do
18 you go to bed?

19   A.   I usually go to bed at ten o'clock.

20   Q.   And we're -- we're taking this deposition in
21 your kitchen now, aren't we?

22   A.   Yes.

23   Q.   Okay.  And once we're done asking some of the
24 questions, we're going to videotape different parts of
25 your house.  And maybe you could just kind of point,

Heartland Court Reporters
Carol A. McCue, RMR

EXHIBIT ___K___
PG. __3__ OF __5__
E-mail:  carol.mccue@acsalaska.net

Telephone:  907-452-6727
Fax:  907-488-7701

Deposition of Virginia Ezell
Taken December 14, 2006

Morgan v. Ezell
Case No. 4FA-05-1876 CI

---

Page 29

1  Q.  -- space there?
2  A.  Yes.  They work -- they work pretty well.
3  Q.  And they look like the foam kind that you
4  squeeze them?
5  A.  Yes, you squeeze them and put them in and then
6  they expand when they are in there.
7  Q.  Okay.  Good.  And I think your testimony is
8  that the bedroom in the basement is right below you
9  here?
10  A.  Yes.
11  Q.  Okay.  And then if we could go, show where
12  the -- there's a bathroom and then there's the door; is
13  that right?
14  A.  Yes.
15  Q.  The first door?  And then the videographer has
16  opened that door, and then that stairway is to your
17  left there, isn't it?
18  A.  Yes, to the left.
19  Q.  And the back door that comes into the house if
20  he's bringing guests in, he can come in right through
21  there?
22  A.  Yes.
23  Q.  And this is where you can kind of peak around
24  the corner and see the drums?
25  A.  Yeah.  Yeah.  Yeah, I guess I --

---

Page 30

1  Q.  Well --
2  A.  Yeah, I know they're there.  And I can see a
3  piece of them, and I know they are all spread out like
4  that.
5  Q.  Okay.
6  A.  Because he said -- he told me he had them all
7  down there.
8  Q.  I don't think you need to go down the stairs.
9  The videographer will go and videotape the drums a
10  little bit more and the bedroom down there.
11  A.  All right.
12  Q.  How it's situated right under your bedroom.
13  (Pause.)
14  MR. WAGGONER:  I wonder if we go back, if you
15  could get a picture of the stairs from the down going
16  up, too.
17  (Pause.)
18  MR. WAGGONER:  Okay.  Perhaps we could go off
19  the record for a second.
20  THE VIDEOGRAPHER:  Off record at 1:25 p.m.
21  (Off video record, recess at
22  1:25 p.m., and back on the reported
23  transcript record and video record
24  at 1:26 p.m.)
25  (End of Fill-In Transcript of Video

---

Page 31

1  Record, and continuing on the
2  reported transcript record.)
3  THE VIDEOGRAPHER:  On record at 1:26 p.m.
4  BY MR. WAGGONER:
5  Q.  Okay.  This is Paul Waggoner again.
6  Let's see.  We've talked about Clay
7  Kristiansen.  Do you have any other children?
8  A.  Yes.
9  Q.  And tell us about them.
10  A.  My oldest son is Richard Kristiansen, and then
11  Clay, and then Betty Jean, my daughter by my second
12  husband.
13  Q.  Okay.  And let's see, I forget how long you
14  said you'd lived here.
15  A.  Since 1971.
16  Q.  And do you have any plans to move or do
17  you just intend to continue to live here?
18  A.  I continue -- I'm going to continue to live
19  here as long as I can.
20  MR. WAGGONER:  Okay.  I don't have any further
21  questions.
22  CROSS-EXAMINATION
23  BY MR. FRANICH:
24  Q.  I have just a few, ma'am.  Okay.
25  A.  All right.

---

Page 32

1  Q.  There is apparently some confusion about the
2  dates.  It really has to do apparently more with the
3  year than with the season of the year.  Sometimes some
4  of these reports reflect a 2003 year, and apparently
5  there was some confusion because some of the reports
6  reflect a 2004.
7  A.  Yes.
8  Q.  But is it -- actually, your son was arrested
9  for this assault in 2003; is that correct?
10  A.  No.
11  Q.  Okay.  So which is the correct year?  Was it
12  2003 or was it 2004?
13  A.  Well, she -- she -- the assault was allegedly
14  supposed to have taken place in October of '03.
15  Q.  Okay.
16  A.  And he was arrested in August of '04.  Yeah.
17  Q.  Okay.  So about a year elapsed before he was
18  arrested --
19  A.  Yes.
20  Q.  -- for that assault?
21  A.  Uh-hum.
22  Q.  Okay.
23  A.  Well, less than a year.  November to -- I
24  think that's almost right.
25  Q.  Okay.  So have -- you have given other

---

8 (Pages 29 to 32)

EXHIBIT___K___
PG.___4___OF___5___

Heartland Court Reporters
Carol A. McCue, RMR

E-mail: carol.mccue@acsalaska.net

Telephone:  907-452-6727
Fax:  907-488-7701

### Page 33

1  statements, we have this recorded statement that you
2  gave to someone in --
3      A.   Yes.
4      Q.   -- two thousand -- July 26th of 2005, correct?
5      A.   Yes.
6      Q.   Okay.  When your son was first -- or about the
7  time of your son's arrest, did you also give a
8  statement to the police?  Were you ever interviewed by
9  the police in this matter?
10     A.   When they picked him up, yes.  This was in --
11  of '05.
12          MR. WAGGONER:  When -- when you refer to "this
13  matter," which matter are you referring to?  I object,
14  that's vague.
15  BY MR. FRANICH:
16     Q.   Well, you know that this lawsuit is about
17  something that happened -- allegedly happened in your
18  home in October of 2003; is that correct?
19     A.   Yes.
20     Q.   Okay.  Who -- when is the first time that you
21  were contacted by anyone about that incident?
22     A.   It was when they came in and picked him up,
23  and -- in August.
24     Q.   Of what year?
25     A.   Of '04.

### Page 34

1      Q.   Okay.  And did you give a statement to the
2  police at that time?
3      A.   Not concerning the assault, it was
4  concerning -- it was concerning the third party, they
5  were confused about the third-party business.
6      Q.   And that's because he had -- at some point, he
7  had been released to your third-party custody?
8      A.   Under -- under the DWI arrest.  Not -- not
9  anything else.
10     Q.   And when did he have a DWI arrest?
11     A.   I think it was in May.
12     Q.   Of 2004?
13     A.   4, yeah.
14     Q.   Okay.  And then he was placed in your
15  third-party custody?
16     A.   Yes.
17     Q.   Was supposed to be in your sight and sound?
18     A.   Yes.
19     Q.   And then there was some incident where he is
20  alleged to have violated that condition by going over
21  to Lori Morgan's?
22     A.   That was the incident when the cat -- she told
23  him the cat died and he was very upset about it.
24     Q.   Had he been over there before or after that
25  telephone conversation that you heard one part of?

### Page 35

1      A.   After.
2      Q.   So there was a telephone call and then he left
3  to go over there?
4      A.   Yes.  Yes.  Because he went over -- because he
5  went over there.
6      Q.   Okay.
7      A.   And that was, like, on a Friday and it was
8  Monday -- my Friday or Saturday, and then it was
9  Monday, then the police came and talked to me.
10     Q.   Okay.  And did you know that he was going over
11  there?
12     A.   No.
13     Q.   When did you -- you found out about it first
14  when the police came and talked to you about it?
15     A.   Yes.  Yes.
16     Q.   And at that time, were they then also talking
17  to you about something that had happened almost a year
18  earlier?
19     A.   No.
20     Q.   When did anyone first talk to you about what
21  occurred in October of 2003?
22     A.   Nobody ever did.  I first heard about it when
23  I -- when he had to go to court, after the -- when they
24  came and took him, arrested him.
25     Q.   Well, when you say "nobody ever did," I mean,

### Page 36

1  we have been given a recorded statement that you gave
2  in July of 2005.
3      A.   Uh-hum.
4      Q.   Is -- isn't this the incident that you were
5  talking about at that time?
6      A.   Yes.
7      Q.   Okay.  So someone talked to you in July of
8  2005.  Had anyone ever talked to you before that about
9  it?
10     A.   In July -- no.  No.  That was the first I -- I
11  heard about it.
12     Q.   Did -- and he was arrested, you said, in 2004,
13  in August.  Did you know why he was arrested?
14     A.   He was arrested in May for DWI.
15     Q.   Right.
16     A.   And after that, he -- they -- he would have --
17  he was -- went to court for the DWI, and they arrested
18  him right then and there for the -- for the assault,
19  and that was the first I heard of the assault.
20     Q.   Okay.  Now, so that -- from May --
21     A.   Uh-hum.
22     Q.   -- on, when was the first -- so May, when they
23  arrested him on the DUI is --
24     A.   Uh-hum.
25     Q.   -- the first time that you heard about the

EXHIBIT         K
PG.        5    OF   5

9 (Pages 33 to 36)

Heartland Court Reporters
Carol A. McCue, RMR

E-mail:  carol.mccue@acsalaska.net

Telephone: 907-452-6727
Fax:  907-488-7701